E-FILED
Friday, 14 July, 2006 04:27:53 PM
Clerk, U.S. District Court, ILCD

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE CENTRAL DISTRICT OF ILLINOIS
2               SPRINGFIELD DIVISION

3

4   UNITED STATES OF AMERICA,        )
                                     )
5            PLAINTIFF,              )     05-30028
                                     )
6        VS.                         )
                                     )
7   DOSSIE SANDERS and               )     SPRINGFIELD, ILLINOIS
    ANDEATTE SANDERS,                )
8                                    )
             DEFENDANTS,             )
9

10

              TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE JEANNE E. SCOTT
              U.S. DISTRICT JUDGE
12

    NOVEMBER 3, 2005
13

    A P P E A R A N C E S:
14

    FOR THE PLAINTIFF:          MS. PATRICIA McINERNEY
15                              ASST. U.S. ATTORNEY
                                318 S. SIXTH STREET
16                              SPRINGFIELD, ILLINOIS

17  FOR DEFENDANT DOSSIE
    SANDERS:                    MR. PETER WISE
18                              ATTORNEY AT LAW
                                1231 SOUTH EIGHTH
19                              SPRINGFIELD, ILLINOIS
    FOR DEFENDANT ANDEATTE
20  SANDERS:                    MR. JON GRAY NOLL
                                ATTORNEY AT LAW
21                              802 SOUTH SECOND
                                SPRINGFIELD, ILLINOIS
22

23  COURT REPORTER:            KATHY J. SULLIVAN, CSR, RPR
                               OFFICIAL COURT REPORTER
24                             600 E. MONROE
                               SPRINGFIELD, ILLINOIS
25                             (217) 525-4199

2

```
 1                    I N D E X

 2   WITNESS              DIRECT   CROSS   REDIRECT   RECROSS

 3   STEVE DAHLCAMP        5/83    29/46     56

 4

 5

 6

 7

 8

 9

10

11

12                    E X H I B I T S

13
     GOVERNMENT'S EXHIBIT
14   NUMBER                  IDENTIFIED    ADMITTED

15

16

17

18

19   DEFENDANT'S EXHIBIT
     NUMBER                  IDENTIFIED    ADMITTED
20
     Exhibit 1                  27            60
21   Exhibit 3                  11            60
     Exhibit 4                  12            60
22   Exhibit 5                  12            60
     Exhibit 9                  27            60
23   Exhibit 10                 27            60

24

25
```

P R O C E E D I N G S

*    *    *    *    *    *    *    *    *    *    *

THE COURT:  All right.  This is case
2005-CR-30028, United States of America versus
Dossie Sanders and Andeatte Sanders.

Let the record reflect that the Government is
present by Assistant United States Attorney Patricia
McInerney.  Both defendants are present in person
and with counsel; attorney John Noll is present for
Mrs. Sanders.

MR. NOLL:  Good morning, Judge.

THE COURT:  And attorney Peter Wise is
present for Mr. Sanders.

MR. WISE:  Good morning, Judge.

THE COURT:  Good morning.

The defense filed some motions, including a
motion to suppress evidence, which at least as to
that one it seemed to me would require some
evidence, so I scheduled a hearing today on the
pending motions.

Do you want to start with the motion to
suppress or did you have different plans?

MR. WISE:  Your Honor, I think that the
evidence, at least from my prospective, overlaps to
some degree, and I think this all starts with the

1    identification issue.

2           THE COURT:  All right.

3           MR. WISE:  And I think that's where we

4    should start.

5           THE COURT:  Is that agreeable with other

6    counsel?  Ms. McInerney?

7           MS. McINERNEY:  Yes, Your Honor, that's

8    agreeable.

9           THE COURT:  Mr. Noll?

10           MR. NOLL:  Judge, I'm not sure I have

11    standing on that issue, but it's agreeable to me.

12           THE COURT:  Ms. McInerney.

13           MS. McINERNEY:  Your Honor, technically,

14    the Government's position would be that motion to

15    suppress, what he has raised is a legal issue that

16    the Court could rule on without any evidence to that

17    issue.  However, the identity is a separate motion

18    and the motion to quash arrest would be a separate

19    motion to --

20           THE COURT:  I'm sorry, the motion to

21    suppress identification; I'm sorry if I mislead you;

22    on that one I think we need evidence.  So let's

23    start there.

24           MR. WISE:  I have the burden, I think.

25           THE COURT:  Right.  It's you unless the

1    Government wants to go first.  And apparently she's

2    yielding to you, Mr. Wise.  Starting with the motion

3    to suppress identification.

4         (The witness was sworn.)

5         THE COURT:  Officer, if you'll have a seat

6    right over here, please.  Move that out of your way.

7    There you go.

8         You may proceed, Mr. Wise.

9         MR. WISE:  Thank you.

10              STEVE DAHLCAMP

11    called as a witness herein, having been duly sworn,

12    was examined and testified as follows:

13              DIRECT EXAMINATION

14    BY MR. WISE:

15         Q.  Will you state your name, please?

16         A.  Steve Dahlcamp.

17         Q.  And Officer Dahlcamp, you're a Springfield

18    police officer?

19         A.  Correct.

20         Q.  You've been so for how long?

21         A.  Approximately nine years.

22         Q.  And what are your current duties?

23         A.  I'm a neighborhood police officer.

24         Q.  Where are you a neighborhood police officer?

25         A.  Beat 500.

1          Q.    Which is?

2          A.    South of South Grand.  Chatham to -- 11th

3    all the way to Chatham, Illinois.

4          Q.    On March 2nd of this year were you a

5    neighborhood police officer for that same area?

6          A.    No.

7          Q.    Okay.  What were your duties?

8          A.    Patrol.

9          Q.    Okay.  On that day in the afternoon you were

10   dispatched to a store known as Birds 'N Brooks?

11         A.    Correct.

12         Q.    That's a gun shop, Army/Navy surplus store

13   on South 6th Street?

14         A.    Correct.

15         Q.    And did the dispatcher tell you that a store

16   employee had called with some information and that's

17   what lead you to be dispatched to there?

18         A.    I don't remember what the call originally

19   was.  I was there to take a report.

20         Q.    Okay.  And you did that?

21         A.    Correct.

22         Q.    You went there and you spoke with a Phil

23   Davis?

24         A.    Correct.

25         Q.    Phil Davis is a store employee at the Birds

1    'N Brooks?

2        A.    Correct.

3        Q.    And when you spoke to Mr. Davis, he told you

4    that -- did he tell you that he had called the

5    Springfield Police Department about an incident that

6    had happened in the store earlier in the afternoon?

7        A.    Correct, yes.

8        Q.    Okay.   He had told you when you were taking

9    the report, Mr. Davis told you that a black male had

10   come into the store with a .40 caliber -- with a --

11   asking for some .40 caliber ammunition?

12       A.    Correct.

13       Q.    And this black man handed Mr. Davis a

14   handgun?

15       A.    Correct.

16       Q.    Mr. Davis looked at the gun and spent some

17   time examining it, he told you?

18       A.    Yes, he cleared the gun and then pulled the

19   magazine out, made sure there was no live

20   ammunition.

21       Q.    I'm sorry, I didn't mean to step on you

22   there.   When you say he cleared the gun, he made

23   sure there was no live round in the chamber?

24       A.    Yes, made it safe.

25       Q.    And then pulled out the magazine of the gun?

1    A.  Correct.

2    Q.  And in examining the gun, he realized that

3  the gun required .357 caliber ammunition and not .40

4  caliber ammunition, correct?

5    A.  Correct.

6    Q.  And he told you he made the customer, who

7  was looking for .40 caliber ammunition, aware that

8  he really needed .357 caliber ammunition?

9    A.  Correct.

10    Q.  The customer asked for that ammunition, and

11  Mr. Davis told you that he asked for an FOID card?

12    A.  Correct.

13    Q.  The customer said -- turned to a female that

14  was with him; at least this is what Mr. Davis is

15  telling you, correct?

16    A.  Yes.

17    Q.  And told you this female had the FOID card?

18    A.  Correct.

19    Q.  At that point Mr. Davis told you that he

20  refused to sell ammunition to the woman, believing

21  she -- that she would simply give it to the male

22  customer, right?

23    A.  In a roundabout way, yes.  He refused.  She

24  went back out to the car, got a FOID, came back

25  in --

1      Q.   What --

2           THE COURT:  It might be simpler just to ask

3    him what did Mr. Davis tell you.  You're laboring to

4    testify here.

5      Q.   Mr. Davis told you what happened at this

6    point when the -- when the male wanted to purchase

7    identification -- or purchase ammunition?

8      A.   I'm sorry, what was your question?

9      Q.   Will you tell Judge Scott what Mr. Davis

10   told you happened when the male indicated that he

11   did not have a FOID card?

12     A.   Mr. Davis told me that he would not hand

13   them back to the black male.  His female companion

14   went out to get her card, produced a FOID card,

15   still wanted to buy ammunition.  And he refused,

16   telling her that he knew that that ammunition was

17   going to be for the black male that was in the

18   store, so he refused to sell it to him.

19     Q.   Right.

20          They then -- Mr. Davis told you that the two

21   people then left the store, correct?

22     A.   Correct.

23     Q.   And what did he do?

24     A.   He called the police department.

25     Q.   Prior to phoning the police department, did

1    he follow the two people out enough -- or out the

2    door so he could get a registration?

3        A.   He got a license plate, yes.  I don't know

4    if he followed them out the door or what.  He was

5    able to tell us a license plate number.

6        Q.   Mr. Davis told you that?

7        A.   Correct.

8        Q.   Mr. Davis gave you a description of the

9    black man?

10       A.   Correct.

11       Q.   He gave a description of age as 27 to 30

12   years old?

13       A.   Correct.

14       Q.   And what was his description in terms of

15   height?

16       A.   If I could see the report to refresh my

17   memory.  I do believe about six foot, 150 pounds.

18           MR. WISE:  Judge, may I -- if he needs to

19   take a look?

20           THE COURT:  That's fine.

21       A.   If that's what is in the report.

22           THE COURT:  If no one objects, you may do

23   so.

24       Q.   Do you recognize this as your report?

25       A.   Yes, sir.  Six foot, 150 pounds, correct.

1    Q.   Okay.  Mr. Davis told you that the black

2    gentleman was wearing a black Starter type jacket?

3    A.   Correct.

4    Q.   You know what a Starter type jacket is,

5    correct?

6    A.   Correct.

7    Q.   Okay.  A Starter jacket is a jacket that --

8    well, made by a company called Starter?

9    A.   Correct.

10   Q.   And these jackets have -- often have pro or

11   college team sports logos on them?

12   A.   Often they do.

13   Q.   Okay.  And the color of the jacket

14   corresponds with the team colors of the team that's

15   shown on the logo often times?

16   A.   Sure.

17   Q.   For instance, if there's a St. Louis Ram's

18   Starter jacket, the colors are going to be blue and

19   yellow and it's going to have a Ram's insignia on

20   it?

21   A.   Sure, if it's a team jacket, yes.

22        MR. WISE:  Your Honor, may I approach?

23        THE COURT:  Yes.

24   Q.   I'm going to show you what has been marked

25   as Defense Exhibit 3 for identification.  Do you

recognize that as a photograph of a Starter type

jacket?

     A.   Could be.  I mean if that's what you say it

is, yes.

     Q.   Well, I'm asking you, I'm not telling you

it's anything?

     A.   It could be, yeah.  I mean some have hoods,

some don't.  Some are team players, some don't.

Starter type jacket to me is a silky material.  It's

not a long coat, about hip length.

     Q.   Do you recognize Defendant's Exhibit 4 as a

Starter type jacket?

     A.   Yes.

     Q.   And the same with Defense Exhibit 5?

     A.   Yes.

          THE COURT:   These are all pictures, right?

          MR. WISE:   Correct.

     Q.   A Starter type jacket that you're familiar

with has a pocket on the front, right below the

chest area?

     A.   No.  I mean some do, sure.

     Q.   Okay.  And most Starter jackets that you've

seen are pull-over type jackets?

     A.   No.

     Q.   Okay.  You understand --

1        A.   Most, no.

2        Q.   Okay.   Mr. Davis described the black

3    gentleman that was in the store as wearing jeans?

4        A.   Correct.

5        Q.   And described the gentleman as wearing a

6    black -- excuse me, a dark stocking cap?

7        A.   Correct.

8        Q.   Okay.   Mr. Davis did not describe the

9    gentleman as having any facial hair, correct?

10        A.   Not that I recall.

11        Q.   Okay.   Did not describe the person as having

12    a beard?

13        A.   Not that I recall.

14        Q.   Mr. Davis did not describe the person as

15    having any gold teeth?

16        A.   Not that I recall.

17        Q.   Well, had you heard that from Mr. Davis,

18    those are things you would have documented?

19        A.   Correct.

20        Q.   And you didn't document any description of

21    facial hair or gold teeth?

22        A.   No.

23        Q.   Mr. Davis did not indicate whether this

24    black man was a light skinned or a dark skinned

25    black person?

1      A.   Not that I recall.

2      Q.   When Mr. Davis described this jacket as a

3    black Starter type jacket, he did not mention any

4    other distinctive characteristic of the jacket,

5    simply black and Starter type was what he said,

6    right?

7      A.   That's what I put in my report, yes.

8      Q.   Mr. Davis didn't represent to you that the

9    jacket had any type of trim or pattern to it?

10     A.   Per my report I didn't put it in there, but

11   I do recall he said there was silver in it, silver

12   lining or something like that.   And if it wasn't in

13   the report, then --

14     Q.   Pardon?

15     A.   If it wasn't in my report, there's --

16     Q.   There's nothing --

17     A.   But I do recall that.

18     Q.   Pardon?

19     A.   I do recall that.

20     Q.   Mr. Davis, when he talked to you, he said

21   the gentleman was simply wearing jeans, correct?

22     A.   Correct.

23     Q.   You know that blue is a common color for

24   jeans?

25     A.   It's a common color, correct.

1    Q.  Davis didn't describe blue, did he?

2    A.  Not that I recall.

3    Q.  Didn't describe black or any other color?

4    A.  Not that I recall.

5    Q.  When you go to the store to buy a pair of

6    jeans there's enough different styles on the rack to

7    make your head spin?

8    A.  Correct.

9    Q.  Mr. Davis didn't describe any particular

10   style of the jeans worn by the black gentleman that

11   he was describing to you?

12   A.  No.

13   Q.  And Mr. Davis described this dark cap --

14   A.  Correct.

15   Q.  -- as a stocking cap?

16   A.  Correct.

17   Q.  He didn't give you any distinguishing

18   features other than its color as dark?

19   A.  No.

20   Q.  Did he tell you anything about any sports

21   team insignias on the cap?

22   A.  No.

23   Q.  When it comes to winter hats, dark is an

24   extremely common color, correct?  Or dark shades?

25   A.  Sure.

1      Q.   After you spoke with Mr. Davis -- well,

2   Mr. Davis gave you the license plate number that he

3   had jotted down?

4      A.   Correct.

5      Q.   You did what with that license plate number?

6      A.   I ran it through the -- our computer system

7   and found out who it belonged to.

8      Q.   And you found out that the -- that the

9   license -- the registration was associated with a

10   person by the name of Andeatte Sanders?

11      A.   Correct.

12      Q.   At an address on Edwards Street?

13      A.   Correct.

14      Q.   1629?

15      A.   Correct.

16      Q.   You went to that address?

17      A.   Correct.

18      Q.   And there was a car there that -- there was

19   a car there with that license plate, that

20   registration on it?

21      A.   Right, correct.

22      Q.   At that point did you -- you called for

23   another officer, an Officer Russell?

24      A.   Correct.  I called for another officer and

25   Officer Russell happened to show up.

1    Q.    Okay.    You -- the two of you went to the

2    door of this home at 1629 Edwards?

3    A.    Yes.

4    Q.    And speaking through the door, you made

5    contact with a person that Officer Russell knew as

6    Dossie Sanders, right?

7    A.    Correct.

8    Q.    And Dossie indicated that he did not want to

9    speak to you all, correct?

10    A.    Correct.

11    Q.    At the same time you all were dealing with

12    an issue of a car that was in the street and running

13    that -- dealing with that issue, too?

14    A.    Yes, there was nobody around.

15    Q.    Okay.    As you were getting that issue

16    resolved, Mr. Sanders came out of the house,

17    correct?

18    A.    Correct.

19    Q.    And was speaking to Officer Russell?

20    A.    Correct.

21    Q.    And then you joined that conversation?

22    A.    Correct.

23    Q.    You asked Officer Russell if -- excuse me,

24    you and Officer Russell asked Dossie Sanders if he

25    had been at Birds 'N Brooks at around 5:00 in the

1    afternoon?

2        A.   Correct.

3        Q.   Right -- the time you were talking to him

4    was 5:30, quarter to six, ballpark?

5        A.   Yes.

6        Q.   Okay.   And he told you that he had not been

7    at Birds 'N Brooks?

8        A.   Yes.

9        Q.   And explained that he had been at his

10   mechanic's picking up a car that had some service

11   done to it?

12       A.   Correct.

13       Q.   After this conversation, you arrested Dossie

14   Sanders, correct?

15       A.   Eventually.

16       Q.   You handcuffed him and put him in one of the

17   police cars?

18       A.   Correct.

19       Q.   Okay.   Now, the police cars that were there,

20   at that point Officer Russell had a car there,

21   correct?

22       A.   Correct.

23       Q.   You did?

24       A.   Correct.

25       Q.   And was there a third officer that showed

1    up?

2        A.    Eventually.    I don't know if he was there at

3    that time.    Officer Baker showed up and Sergeant

4    Henry showed up.

5        Q.    Okay.    In separate cars?

6        A.    Yes.

7        Q.    All four cars -- all four Springfield Police

8    Department police cars that were there were marked

9    squad cars?

10        A.    Yes.

11        Q.    Meaning they had the white background with

12    the red and blue striping on the side?

13        A.    Correct.

14        Q.    And the emergency lights on the top of the

15    car?

16        A.    Yes.

17        Q.    And all four officers were in uniform?

18        A.    Yes.

19        Q.    The uniform that you're wearing today?

20        A.    Correct.

21        Q.    The Springfield Police Department blue

22    uniform?

23        A.    Yes.

24        Q.    After arresting Mr. Sanders, you called

25    Birds 'N Brooks, correct?

1          A.   I called Dale Patterson.  I do believe it

2     was a cell phone number.  I don't know if I called

3     the store itself.

4          Q.   Well, you wanted the -- the purpose for

5     calling either the store or the cell phone number

6     you had -- how did you -- well, calling the cell

7     phone number, you wanted to get Mr. Davis down, the

8     store employee, to -- potentially to identify the

9     person you had arrested, correct?

10         A.   No.

11         Q.   Well, a Mr. Patterson came to 1629 East

12    Edwards?

13         A.   Correct, I called him on the cell phone.

14         Q.   Mr. Patterson is the owner of Birds 'N

15    Brooks?

16         A.   Correct.

17         Q.   When you were at Birds 'N Brooks earlier in

18    the day your conversation was with -- largely with

19    Mr. Phil Davis, correct?

20         A.   With Dale standing right behind him, yes.

21         Q.   Mr. Davis was doing the talking about the

22    situation that had unfolded in the store, and

23    Mr. Patterson was standing right behind him?

24         A.   They both were talking.

25         Q.   Okay.   Were you -- did you -- was your

1    purpose to interview each of them, or Mr. Phil

2    Davis?

3        A.    When?

4        Q.    At the store?

5        A.    My purpose was to get what happened.

6        Q.    Okay.   Mr. Davis told you he was the person

7    that had contact with the customers, right?

8        A.    So did Dale Patterson.

9        Q.    Well, let me get this straight.   When you

10    were talking to them, did you interview each one of

11    them separately in this --

12        A.    Interview as in --

13        Q.    Talk to them?

14        A.    Yes, I talked to them both.   They were both

15    standing right there.

16        Q.    You -- well, can you distinguish which of

17    the two people who you now say were standing there

18    were -- which person gave which piece of

19    information?   For instance, was it Mr. Davis or

20    Mr. Patterson that said that he removed the clip

21    from the gun?

22        A.    Mr. Davis told me he removed the clip, and

23    Mr. Patterson corroborated it.

24        Q.    Okay.   With respect to the identification,

25    which person said -- or who do you remember saying

1    that the black person in the store was six feet

2    tall?

3         A.  I don't recall.

4         Q.  Okay.  Which person said or gave the weight

5    as approximately 175 pounds?

6         A.  Don't recall.

7         Q.  Which person said that there were -- that

8    the black person was wearing jeans?

9         A.  In all the questioning, both of them

10   corroborated.  Both of them said it.

11        Q.  You didn't separate them to get a

12   description?

13        A.  No.

14        Q.  Did they come to some mutual consensus on

15   this description?  Or was it one person saying --

16   I'll ask you one question.  Did they come to some

17   mutual consensus?

18        A.  Are you asking between themselves?

19        Q.  Yeah, as they were talking to?

20        A.  Yes, six foot, 150.

21        Q.  Did Mr. Patterson ever add something to a

22   description that -- that Mr. Davis had started?

23        A.  I don't recall.

24        Q.  Did Mr. Davis ever add something to a

25   description that Mr. Patterson had given you?

1      A.   I don't recall.

2      Q.   Who described the coat as black?

3      A.   Mr. Davis, I guess.  I don't know.  Both of

4  them agreed it was black.

5      Q.   No one ever disagreed with what the other

6  may have said?

7      A.   No, not that I recall, no.  If they did, I

8  would note that in my report.

9      Q.   Was it Patterson or Davis who described it

10  as a Starter type jacket?

11      A.   Both agreed.

12      Q.   Well, who said it?

13      A.   I was talking to Mr. Davis.

14          THE COURT:  Do you have any other questions

15  for the witness?

16          MR. WISE:  One second.

17      Q.   When Mr. Patterson -- Mr. Patterson came to

18  1629 East Edwards, correct?

19      A.   To the area, correct.

20      Q.   And you indicated to him that you had two

21  persons there that you wanted him to take a look at,

22  right?

23      A.   Correct.

24      Q.   Well, actually you had told him -- did you

25  tell him that on the phone when you spoke to him,

1    tell him why you wanted him to come to that place?

2        A.   We had set up before I left the store that

3    if I did come in contact with somebody, if he could

4    identify them, he said yes.  That's why he gave me

5    his cell phone number, because the store was

6    closing.  I called him on his cell phone, he came to

7    the scene, and -- is that what you're asking?

8        Q.   Yeah.

9        A.   Okay.

10        Q.   Knowing that he was coming to attempt an

11    identification, did you get Dossie out of a police

12    car and take handcuffs off of him?

13        A.   Did I?  No.

14        Q.   Did anybody else?

15        A.   No.   Well, I'm sorry, excuse me, they did

16    get him out of the police car, yes.

17        Q.   But before Mr. Patterson arrived?

18        A.   I don't recall.

19        Q.   Okay.   Mr. Patterson got there and the first

20    person that you asked him to identify was -- was the

21    woman that was at the address, Mrs. Sanders,

22    correct?

23        A.   Correct.

24        Q.   This is -- this house at 1629 East Edwards

25    is a pretty small house?

1          A.   Are you asking my standards?  It's average.

2          Q.   It sits on a small lot?

3          A.   What do you define as small?  It's a normal

4    size house for that neighborhood.

5          Q.   Okay.  There are, at this point now, when

6    Mr. Patterson arrives, there are four police cars

7    there, correct?

8          A.   Altogether, yes, in the area.

9          Q.   And at least four police officers?

10         A.   Correct.

11         Q.   You pointed out the black woman that was in

12   the yard and asked Mr. Patterson if he recognized

13   her?

14         A.   I didn't point her out, no.

15         Q.   Okay.  There was only one black female in

16   the yard?

17         A.   I don't recall.

18         Q.   As a person that's -- as a police officer

19   that's there, you're certainly keeping track of who

20   is walking into the yard, right?

21         A.   That wasn't my duty at that time.

22         Q.   The only black female that you saw in the

23   yard was Ms. Sanders, correct?

24         A.   That I saw?

25         Q.   Yes?

1      A.   That I was looking at, correct.

2      Q.   Okay.   Mr. Patterson identified her as the

3   woman that had been in his store?

4      A.   Correct.

5      Q.   You then lead Dale Patterson over towards

6   the police car that Dossie Sanders was in?

7      A.   No.

8      Q.   You asked other police officers to get

9   Mr. Patterson out of the police car he had been

10  sitting in?

11     A.   You mean Mr. Sanders?

12     Q.   I'm sorry, Mr. Sanders.

13     A.   I don't recall if he was already out of the

14  car or if I asked them to get him out of the car.  I

15  don't recall.

16     Q.   You asked Mr. Patterson if he recognized

17  the -- Mr. Sanders, correct?

18     A.   I asked him if he recognized the black man

19  in -- the black men.  And there were plenty of black

20  men standing there.

21     Q.   Well, only one of them was in handcuffs,

22  right?

23     A.   Yes, to the best of my knowledge, yes.

24     Q.   Now, you say there was plenty of black men

25  standing there.  Did you make a lineup?

1      A.  No.

2      Q.  Only one of them was flanked by two City of

3  Springfield police officers in handcuffs, right?

4      A.  I don't recall how many police officers were

5  standing next to him.  I know one for sure would be.

6  I'm sure it would be.

7      Q.  You shined the flashlight on the black man

8  with a City of Springfield police officer standing

9  next to him, the black man in handcuffs, right?

10     A.  Correct.

11     Q.  That's the only black man you shined a black

12  light on, correct?

13     A.  Correct.

14     Q.  I'm going to show you what's marked as

15  Defense Exhibit 1 for identification.  Do you

16  recognize that as a picture of Dossie Sanders that

17  was taken at the Springfield Police Department or

18  the county building, one of the two?

19     A.  Yes.

20     Q.  Okay.  Now, I show you what's marked as

21  Defendant's Exhibit 9 for identification.  This was

22  the coat that Dossie Sanders was wearing when you

23  arrested him on March 2nd in the afternoon?

24     A.  Yes.

25     Q.  Okay.  And Exhibit 10, this is the hat that

1    he was wearing?

2        A.   Yes.

3        Q.   Okay.   This hat had the Detroit Tiger's D on

4    the front of it?

5        A.   Yes.

6        Q.   And you saw when you arrested him it has a

7    bill on it?

8        A.   Yeah, sure.  Like --

9        Q.   I'm sorry?

10       A.   Yes, there's a bill there.

11       Q.   And you would describe that as the type of

12   hat Radar O'Reilly wore on MASH?

13       A.   I didn't watch that.

14           THE COURT:   Don't you feel old now,

15   Mr. Wise?

16           MR. WISE:   I guess I do.

17       Q.   Sir, after Mr. Sanders was arrested and

18   later then you worked on getting a search warrant,

19   correct?

20       A.   Correct.

21       Q.   You were absolutely part of the group of

22   police officers that came back to the house with the

23   warrant?

24       A.   Correct.

25       Q.   When you went back to the house you had only

1       the warrant with you, correct?

2           A.   I don't know what you mean.

3           Q.   You didn't have the -- you didn't bring the

4       complaint for the search warrant with you?

5           A.   I don't recall.   I mean I didn't carry

6       anything up there, I was part of the entry team.

7               MR. WISE:   I have no further questions.

8               THE COURT:   Ms. McInerney.

9                   CROSS EXAMINATION

10      BY MS. McINERNEY:

11          Q.   Officer Dahlcamp, when you were called by

12      dispatch to go to Birds 'N Brooks, about what time

13      was it that you received that dispatch?

14          A.   5:18.

15          Q.   And about how long did it take you to get

16      there?

17          A.   About five minutes.

18          Q.   And when you went into the Birds 'N Brooks,

19      who was there?

20          A.   There was the employee Phil and the owner

21      Dale.

22          Q.   And you talked to both of them at this time?

23          A.   Correct.

24          Q.   Did both of them indicate that they had both

25      waited on this particular black male who had asked

```
1    for the .40 caliber ammunition?
2         A.   Yes.
3         Q.   So both of them had contact with him?
4         A.   Correct.
5         Q.   Was it your understanding from your
6    conversations with them that both of them remained
7    there the whole time during the time that
8    Mr. Sanders was in their establishment?
9         A.   Correct.
10        Q.   They also mentioned that there was a female
11   with him?
12        A.   Correct.
13        Q.   And did they give you a description of
14   her --
15             MR. WISE:  Excuse me, I'm going to object
16   to the reference that it was Mr. Sanders in the
17   establishment.  That's a fact that's not in
18   evidence, and move it be stricken.
19             THE COURT:   Sustained.
20        Q.   Well, the black male; I'll rephrase it; the
21   black male that was there, they were both there the
22   whole time the black male was in the establishment
23   to get ammunition?
24        A.   Correct.
25        Q.   Did they give you a description of the
```

1    female?

2        A.    Yes.

3        Q.    Okay.    And do you just by chance recall what

4    that was or do you know if you made a notation in

5    your report?

6            MR. WISE:    I'm going to object to they.

7    Some foundation as to who gave the description and

8    what part of it.

9            THE COURT:    Overruled.    She can ask.

10       Q.    Did they give you a description?

11       A.    Yes.

12       Q.    Do you recall what description was given to

13   you?

14       A.    Not off hand.    I wrote it in my report.

15       Q.    Okay.    And if I showed you that report, that

16   would refresh your recollection?

17       A.    Correct.

18           MS. McINERNEY:    Your Honor, may I approach?

19           THE COURT:    Yes.    He's looked at it.

20       Q.    And so what description was given to you as

21   to what she looked like?

22       A.    Approximately five four, 100 pounds.

23       Q.    And was there -- did they denote to you that

24   they had a relationship in mind as to the female to

25   him?    In other words, was she a wife, a girlfriend,

1    did they characterize her?

2            MR. WISE:  As to her, I think there needs

3    to be foundation as to who spoke.

4            THE COURT:  Well, to shorten it, it would

5    probably help if you would go ahead and do that.

6        Q.  Okay.  Did either one -- did either one of

7    them give you a designation as to what they believed

8    she was relationship wise to Mr. -- to the

9    individual?

10       A.  As I recall both of them indicated that they

11   thought she was his wife, but they were not sure.

12       Q.  And you put down wife in your report, is

13   that correct?

14           MR. WISE:  Objection as to a prior

15   statement used to bolster his in-court testimony.

16           THE COURT:  Overruled.  We're going into

17   what they said.

18       Q.  When they -- when you received -- who

19   provided you the license plate for the car?

20       A.  That would be Mr. Davis.

21       Q.  Okay.  And did he indicate to you even more

22   about the description of that car other than just

23   the license plate?

24       A.  A dark colored Lexus, I think is what I put

25   in the report.

```
 1              THE COURT:  Keep your voice up, you're
 2    fading on us.
 3         A.   A dark colored Lexus.
 4         Q.   So the license plate, as well as the
 5    description and makeup of the car?
 6         A.   Correct.
 7         Q.   And how long were you at Birds 'N Brooks
 8    talking with both Mr. Patterson and Mr. Davis?
 9         A.   To the best of my knowledge no more than
10    fifteen minutes.
11         Q.   And when you left there, what did you do?
12         A.   I ran the plate of the car to find out if it
13    came back to an address.  I went by that address,
14    noticed the vehicle and car matching -- the license
15    plate matching on that car at the residence.
16         Q.   And did the car match the description you
17    were given?
18         A.   Correct.
19         Q.   And what did you do at that time?
20         A.   I pulled down the street and called for
21    backup.
22         Q.   And who arrived?  Who was your backup
23    officer?
24         A.   Officer Russell.
25         Q.   Did you tell Officer Russell why you were
```

1    there, why you needed him?

2        A.    Yes, I gave him a brief description when I

3    called.

4        Q.    Did Officer Russell tell you anything about

5    that residence?

6        A.    Yes.  I said -- I gave him who the car

7    belongs to.  I apologize, I probably don't pronounce

8    the name right; Andeatte Sanders.  I told him

9    there's a green Lexus sitting in the driveway of the

10   residence and he told me that was Dossie Sander's

11   residence.

12       Q.    Did he also tell you he recognized that car

13   as a car Mr. Dossie was seen in?

14       A.    Yes, he said that was Dossie Sanders' car.

15       Q.    Did you give Officer Russell a description

16   of who you were looking for?

17       A.    Yes.

18       Q.    When he received that description did he

19   indicate anything that did or didn't match

20   Mr. Sander's description?

21       A.    He said that matched Mr. Sander's

22   description, yes.

23       Q.    Now, at what point in time did you

24   approach -- about how long was it that you talked

25   with Mr. Russell and then made the approach to the

1    Sanders' home?

2        A.   I talked with Officer Russell no more than

3    five minutes.

4        Q.   Okay.   And the two of you made a plan

5    together as to how you were going --

6        A.   Correct.

7        Q.   -- to approach this?

8        A.   Officer Russell said in his past dealings

9    with Mr. Sanders he will not come and talk to us, he

10   doesn't like police.   So that's why we decided how

11   we were going to talk to him and ask for his

12   cooperation.

13       Q.   Let me digress for just one minute.   I

14   wanted to ask you a question and I forgot to do so.

15       Back when you were at Birds 'N Brooks did

16   either Mr. Davis or Mr. Patterson indicate to you

17   that there was something about the firearm that was

18   presented to them that Mr. -- that the individual

19   had that made them very suspicious?

20       A.   Yes.

21       Q.   What did they -- what were you told and do

22   you recall who told you?

23       A.   They were -- Mr. Patterson and Mr. Davis

24   were suspicious of the fact that Mr. -- the black

25   male in the ammunition shop did not know what kind

1    of gun he had.  Asking for .40 caliber and it was a

2    .357.  They looked at the gun, both of them looked

3    at the gun.  Mr. Davis cleared the gun; which means

4    make it safe; by pulling out the magazine, racking

5    it back to make sure there's no ammunition in the

6    gun.

7        Mr. Davis said when he pulled out the magazine

8    he saw "restricted law enforcement use only" on the

9    magazine of the gun.  Both of them looked at the

10   gun, noticed it was holster worn, not shot worn,

11   which indicated to them that it was a -- and it was

12   a .357 Sig Sauer P229, which is what Springfield

13   Police Department carries.  They were suspicious

14   because they were under the impression that --

15           MR. WISE:  I'm going to object to they.  If

16   he can identify who --

17       A.   Okay.  Mr. Patterson, I'm sorry.

18   Mr. Patterson and Mr. Davis both said that they were

19   suspicious that it was a Springfield police

20   officer's or department issued weapon.

21       Q.   Were you aware when you went to

22   Mr. Sanders -- when you went to the address that

23   came back to the Lexus, were you aware that there

24   were any weapons, Sig Sauer, P229 Sig Sauer that had

25   been stolen or was missing from Springfield police

1    issue?

2         A.   Yes.

3         Q.   Okay.   Now, when you approached -- when

4    Mr. Sanders -- you said you initially approached and

5    Mr. Sanders didn't want to talk to you, but then he

6    did come out.   About how long was it that he was

7    talking to you from behind the door before he

8    finally stepped outside?

9         A.   To the best of my knowledge approximately

10   ten minutes.

11        Q.   And when you -- when he opened the door and

12   you saw him -- may I approach, Your Honor?

13            THE COURT:   Yes.

14        Q.   I'm going to show you what was marked as

15   Defendant's Exhibit 1.   Is that what he looked like?

16        A.   Yes.

17        Q.   As the person depicted there in Exhibit 1?

18        A.   Yes.

19        Q.   And the jacket he has on there, excuse me,

20   the jacket you were shown here in court, is that a

21   Starter type jacket to you, Officer Dahlcamp?

22        A.   Yes.

23        Q.   What kind of pants is he wearing in that

24   picture?

25        A.   Jeans.

1          Q.    And what does he have on his head?

2          A.    A black stoking cap.

3          Q.    And when you looked at him, did he look like

4     he was approximately six feet and weighed 150

5     pounds?

6          A.    He looked approximately six feet,

7     approximately 150 pounds.

8          Q.    And as you looked at him, his weight, did

9     that match the description you were given?

10         A.    Yes.

11         Q.    When you looked at Mr. Sanders when he

12    opened the door, did that description, how he

13    looked, in your mind match what you had been told?

14         A.    Yes.

15         Q.    And the Lexus and the license plate matched

16    what you had been told?

17         A.    Yes.

18         Q.    Now, you said Mr. Sanders denied being at

19    Birds 'N Brooks and told you he had been at a

20    mechanic's?

21         A.    Yes.

22         Q.    Did you inquire further of him about that?

23         A.    Yes.

24         Q.    What did you say to him and what did he say

25    to you?

1        A.   I asked him if he had been at Birds 'N

2    Brooks, he said no.  I said where were you at, he

3    said he was at a mechanic's named Ricky.  I said,

4    where is Ricky's at?  He couldn't describe it.  I

5    said, did you buy anything, do you have any receipts

6    to prove you were at Ricky's?  No.

7        Q.   Did you offer to call Ricky's and verify he

8    was there?

9        A.   Yes.

10        Q.   And he didn't want to do that?

11        A.   No.

12        Q.   Did you ask him who had been driving the

13    Lexus then at about 5:00?

14        A.   Yes.

15        Q.   And who did he tell you?

16        A.   Andeatte.

17        Q.   Did he characterize her as any relationship

18    to him?

19        A.   His wife.

20        Q.   Did you then ask to speak with his wife?

21        A.   Yes.

22        Q.   And what did he tell you?

23        A.   She wasn't home.

24        Q.   Did you notice anybody else there at the

25    house?

```
1          A.   Not at that time.

2          Q.   At any time did you notice someone at the

3    house?

4          A.   Yes.

5          Q.   And was that person male or female?

6          A.   Female.

7          Q.   Looking out a window?

8          A.   Yes.

9          Q.   Did you offer -- did you ask if she had a

10   cell phone?

11         A.   Yes.

12         Q.   That you could call her?

13         A.   I asked Mr. Sanders if he would call her.

14   He said no.

15         Q.   Did you ask if she had a cell phone that you

16   could call her then?

17         A.   Yes, I offered my cell phone for him to call

18   her, and he refused.

19         Q.   Did he even indicate if she had a cell

20   phone?

21         A.   Yes.

22         Q.   Did she have one?

23         A.   Correct.

24         Q.   So he wouldn't call?

25         A.   No.
```

1    Q.  About what time did you call Mr. Patterson

2    to come to the scene?

3    A.  I don't recall.  It's in my report, I do

4    believe, if I could look at my report, please.

5    What was the question again?

6    Q.  About what time did you call Mr. Patterson

7    to come to the scene?

8    A.  I don't recall.  It would have been

9    approximately, if you're asking approximate time,

10   approximate time would be 18:56 hours.

11   Q.  Now, is that when you called or is that when

12   you --

13   A.  That's when he arrived.  Approximately

14   fifteen minutes before that is when the phone call

15   was made.

16   Q.  Okay.  So about a quarter to seven, twenty

17   minutes to seven?

18   A.  Approximately.

19   Q.  So that would have been a little over --

20   about an hour after you had left Birds 'N Brooks,

21   would that be about right?

22   A.  Correct.

23   Q.  And Mr. Patterson arrived, where did he

24   park?

25   A.  Caddy-corner from the house.  The house sits

1    on a corner lot on the northwest corner.  He parked

2    on the southeast corner of that intersection.

3        Q.   Were -- besides yourself and the other

4    officers that were there, I think you've testified

5    there were three other cars besides your's, and

6    three other officers there besides yourself?

7        A.   Correct.

8        Q.   Were there any other people that had

9    gathered on the street during the period of time you

10   were there?

11       A.   Yes.

12       Q.   Okay.  Do you recall how many?

13       A.   Approximately four to five.

14       Q.   Could you tell the race of these

15   individuals?  Were they black, white?

16       A.   Black men.

17       Q.   When Mr. Patterson arrived, what did you say

18   to him regarding his -- regarding your request to

19   identify anyone there at that location?

20       A.   I asked Mr. Patterson if he recognized a

21   black male.

22       Q.   Nothing else?

23       A.   Nothing.

24       Q.   Did he hesitate when he made -- or, well,

25   did he recognize someone?

1      A.   Yes.

2      Q.   And who was it that he recognized?

3      A.   The black male he recognized as Dossie

4   Sanders.

5      Q.   And did he make any comment when he

6   identified Mr. Sanders, when he said yes, I

7   recognize -- exactly what did you recall him saying?

8   I realize this has been a while?

9      A.   It is protocol, I do it every time I ask

10   someone to identify someone.  I asked him, do you

11   recognize the person.  In this case, do you

12   recognize the black male.  Mr. Patterson said yes.

13   I said, how do you recognize him?  He said, as the

14   black male that was in my store.

15      Q.   Did he indicate anything else with regard to

16   his recognition of Mr. Sanders at that time?

17      A.   Yes, he said he was wearing the exact same

18   cloths that he was wearing when he was in his store.

19      Q.   Did he -- then did you have him identify

20   anyone else?

21      A.   Yes.

22      Q.   And who was that?

23      A.   I don't mean to be rude.  Can you tell me

24   how to pronounce Mrs. Sanders' first name?

25           THE COURT:   Let's call her Mrs. Sanders.

1          A.   Yes, Mrs. Sanders.

2          Q.   And what was the procedure you used to have

3     him identify Ms. Sanders?

4          A.   Do you recognize any black females.

5          Q.   And what did he say?

6          A.   Yes.

7          Q.   And where did he recognize the black female

8     from?

9          A.   He said again, she was wearing the exact

10    same cloths that she was wearing when she was in his

11    store.

12              MS. McINERNEY:   May I have a moment?

13              THE COURT:   Yes.

14         Q.   When you were at Birds 'N Brooks and you

15    were talking with both Mr. Patterson and Mr. Davis,

16    did they indicate to you where in the store the

17    black male had stood when he presented the firearm

18    and asked for the ammunition?

19         A.   At the front counter right inside the front

20    door.

21         Q.   And did they indicate to you where each one

22    of them had been standing when he did that?  When

23    the black male presented the gun and asked for the

24    ammunition?

25         A.   Yes.

1    Q.   And where was it they were standing at that

2    time?

3    A.   The black male was standing in the front, at

4    the front counter inside the door.  His wife was

5    standing next to him.

6    Q.   And where was Mr. Davis and Mr. Patterson?

7    A.   Mr. Davis was directly across the counter,

8    Mr. Patterson was approximately -- eventually came

9    up after Mr. -- latter identified as Mr. Sanders

10   asked for Dale Patterson.  Dale came to the front,

11   stood right behind Mr. Davis, approximately two

12   feet.

13   Q.   Okay.  How deep is the counter?  From being

14   there, how deep is the counter?

15   A.   I'd say approximately two feet.

16   Q.   You indicated just while ago that when

17   Mr. -- when the black male came in, that Mr. Davis

18   was the first person to talk with him, is that

19   correct?

20   A.   Yes.

21   Q.   And that the black male asked specifically

22   to speak with Dale?

23   A.   Yes.

24   Q.   Meaning Dale Patterson?

25   A.   Yes, it would mean Dale Patterson.

1          Q.    And that's when Dale Patterson came over

2    then and talked with him?

3          A.    Yes.

4              MS. McINERNEY:    Those with my questions,

5    Your Honor.

6              THE COURT:    Mr. Noll.

7                    CROSS EXAMINATION

8    BY MR. NOLL:

9          Q.    Mr. Dahlcamp, how long have you been a

10   police officer with S.P.D.?

11         A.    Approximately nine years.

12         Q.    Did you bring your weapon today, by any

13   chance?

14         A.    Yes.

15         Q.    And I don't know, a Sig Sauer, is that --

16   first of all, is it a brand name or is that a model

17   name?

18         A.    Correct, brand name.

19         Q.    Like Smith and Wesson, for --

20         A.    Sig Sauer.

21         Q.    Sig Sauer is the company?

22         A.    I don't know much about guns, but they tell

23   me it is the Sig Sauer.    I guess it is the

24   manufacturer, I would have to assume.

25         Q.    The Sig Sauer weapon you carry, you carry

1    one of these, correct?

2         A.   Yes.

3         Q.   And this is the issued weapon for the

4    Springfield Police Department?

5         A.   Correct.

6         Q.   And each of you are issued the weapon by

7    serial number, correct?

8         A.   Correct.

9         Q.   And you are responsible for that weapon?

10        A.   Correct.

11        Q.   Now, the item in question here appears to be

12   a magazine, at least that's what Mr. Davis told you

13   that day, correct?

14        A.   I don't know what you mean.

15        Q.   Okay.  Let me break it down.

16        Mr. Davis examined the weapon that had been

17   brought to him by a black man on the day in

18   question?

19        A.   Correct, yes.

20        Q.   And in examining this weapon he cleared the

21   weapon?

22        A.   Correct.

23        Q.   And in clearing the weapon, what does one

24   do?

25        A.   One would first drop the magazine and then

1    rack the slide back to make sure there's no bullets

2    in it.

3         Q.    Now, when you hold the weapon there's a

4    button you hit?

5         A.    Correct.

6         Q.    And that releases the magazine?

7         A.    Correct.

8         Q.    The magazine jumps out.  How many rounds

9    does your magazine hold?

10        A.    Twelve.

11        Q.    Twelve rounds?

12        A.    Yes.

13        Q.    The next thing you do is pull the slide back

14   and lock it and check to see if there's a bullet in

15   the weapon?

16        A.    Correct.

17        Q.    If that's clear, then the weapon is safe to

18   handle, correct?

19        A.    Yes.

20        Q.    With leave of Court I would ask the

21   officer -- well, let me ask you this; do you have a

22   magazine issued to you by the City of Springfield?

23        A.    Correct.

24        Q.    Does it have this wording for police

25   enforcement only on it?

1    A.  I don't know.

2        MR. NOLL:  Well, Your Honor, I would ask

3    him to clear his weapon, to pop the magazine and

4    let's examine it, because that's the basis on which

5    the search warrant was asked.

6        THE COURT:  Any objection?

7        MS. McINERNEY:  Well, I guess my only --

8    you know, I don't mind going through the

9    demonstration, I suppose, except I want to know that

10   this weapon is the same as what they had --

11       THE COURT:  All right.  There's a relevance

12   objection.  I'm going to sustain it.  It was the

13   weapon at Birds 'N Brooks.

14   A.  Sir, can I say something?

15   Q.  Do you think it is relevant for the

16   proceedings?

17   A.  For your question.  I don't carry --

18   Q.  Because I want to inform the Court of the

19   status of the weapons?

20   A.  I understand what you're saying.  I don't

21   have my weapon in the courtroom.

22   Q.  You didn't bring it in the courtroom?

23   A.  It has to be secured before I come up and I

24   don't carry that model.

25   Q.  So that not all the officers in the

```
 1    Springfield Police Department carry the .357 Sig
 2    Sauer, correct?
 3         A.   That's a fair statement.  I do carry the
 4    .357 Sig Sauer.
 5         Q.   But not everybody in the police department
 6    does?
 7         A.   Correct.
 8         Q.   Now, the clip in question, when you asked
 9    Mr. Davis, did he tell you that the clip said
10    Springfield Police Department for Springfield Police
11    Department use only or words to that affect?
12         A.   No.
13         Q.   Is it improper or illegal for a person to
14    hold a magazine that says for police -- for law
15    enforcement purposes?
16         A.   I'm sorry, can you state it again.
17         Q.   Okay.  We know that Mr. Davis called you up
18    that day?
19         A.   Correct.
20         Q.   And he said hey, I had a magazine I was
21    looking at that said for law enforcement purposes
22    only?
23         A.   No.
24         Q.   Or words to that effect?
25         A.   He said there was a gun that was holster
```

worn that looked -- can I start at the beginning?

Q. Let me see if we can get there just by asking questions --

THE COURT: We would stay two hours if you started again. Next time I'm going to have the Government call the witness, because you all are so use to cross examining you can't get the story out in a coherent fashion. But you may proceed as you wish.

Q. Will you tell the judge the story you were about to tell?

A. You said he called and asked if we had any magazines stolen that say for law enforcement use only. The answer is no. He called to ask if a weapon had been stolen. He said it was odd that the owner comes in and doesn't know what kind of weapon he had. And it appeared to be one that was holster worn, not shot one.

Q. What does that mean?

A. Holster worn is we practice taking our guns out of our holster numerous, numerous times without firing it just to get --

Q. Does the blue wear down on the weapon?

A. The rubber grips, the bluing, stuff like that. That's what made him suspicious that -- first

1    with the fact that he didn't know what kind of gun

2    he had.  It looked like the issue that we carry, a

3    very common gun that Springfield -- not all, but

4    most Springfield police officers carry.  And he

5    called to inquire if we had any stolen.  It was not

6    about specifically a magazine that was stolen.

7        Q.    But he did mention this magazine?

8        A.    Yes, correct.

9        Q.    Now, the Springfield Police Department, when

10   they issue a gun, they issue a magazine?

11       A.    Yes.

12       Q.    How many do you get, four?

13       A.    Three.

14       Q.    Do the magazines reflect the wording that

15   Mr. Davis told you that day, for police purposes

16   only, or words to that effect?

17       A.    I don't recall.

18       Q.    Do you know?

19       A.    Do I know for a fact?  No.

20       Q.    Okay.  So that this magazine could have come

21   from a variety of sources, correct?

22       A.    Yes.

23       Q.    And the Sig Sauer is a fairly common weapon

24   used by law enforcement throughout the country,

25   correct?

1        A.   I have no idea.

2        Q.   Now, the Birds 'N Brooks, did they have a

3    video camera set up within the store like a security

4    camera that day?

5        A.   I don't know.

6        Q.   Did you ask?

7        A.   I'm sure I did, but there was not one given

8    to me.  A tape given to me.

9        Q.   A .357 Sig Sauer, if a person has a FOID

10    card; assuming that it is not stolen, of course; it

11    would be proper to have it in their possession, to

12    the best of your knowledge?

13        A.   Yes, sir.

14        Q.   Did you ask Mr. Davis that day whether or

15    not the black gentleman or the black woman had been

16    in the store previously?

17        A.   I don't recall.

18        Q.   When you asked Mr. Sanders, were you in

19    Birds 'N Brooks, did you tell him what Birds 'N

20    Brooks was?

21        A.   I don't recall.

22        Q.   To the best of your knowledge did he appear

23    to know what Birds 'N Brooks was?

24        A.   Yes.

25        Q.   He did?

1     A.   Yes.

2     Q.   How did he evidence that?

3     A.   He was definite he was not at Birds 'N

4  Brooks.  Kept telling me over and over that he was

5  not at Birds 'N Brooks.  I would assume he knew what

6  Birds 'N Brooks was.

7     Q.   That was an assumption on your part?

8     A.   Yes.

9     Q.   Finally, the magazine in question, does that

10  have a serial number on it?

11     A.   I don't know.

12     Q.   The weapon has a serial number?

13     A.   Correct.

14     Q.   And that can be traced to a specific

15  individual?

16     A.   Yes.

17     Q.   Was it traced to a specific individual in

18  this case?  Do you know?

19     A.   Are you asking me after the whole

20  investigation?

21     Q.   Yes?

22     A.   Yes.

23     Q.   And who was that?

24     A.   Officer Barry Riddell.

25     Q.   And was his weapon stolen at that time, or

1    had been missing?

2        A.   Yes.

3        Q.   But the magazine is not traceable to this

4    particular weapon?

5        A.   Any magazine is not traceable to a weapon.

6        Q.   The firearm itself, the Sig Sauer, if you

7    examine the Sig Sauer, look inside the bolt, what

8    have you, does it have any type of engraving that

9    says for police purposes only, or words to that

10   effect?

11       A.   Anywhere on the gun you're asking?

12       Q.   Yes, sir?

13       A.   Not to my knowledge.

14       Q.   So the weapon itself wouldn't signal per se

15   it is a police weapon?

16       A.   This specific gun, no.

17       Q.   So if I laid out ten of them across the

18   rail, one was the officer's in question, you

19   couldn't -- basically you couldn't tell them apart

20   except for the serial number?  Visually they would

21   all look essentially the same?

22       A.   Yes, sir.

23           MR. NOLL:  I have nothing further.

24           THE COURT:  Okay.  Anything finally,

25   Mr. Wise, of this witness?

1            MR. WISE:  I have a couple of questions,

2    Judge.

3            THE COURT:  All right.

4                    REDIRECT EXAMINATION

5    BY MR. WISE:

6        Q.  When Mr. Patterson came to 1629 East

7    Edwards, it was dark?

8        A.  Correct.

9        Q.  You were asked a number of questions about

10   conversations that you had with various people.  I

11   have a few questions about those.

12           First of all, you -- do I understand you to

13   indicate that when the black male walked into Birds

14   'N Brooks, that either Mr. Davis or Mr. Patterson

15   told you that the black male said, I want to talk to

16   Dale?

17       A.  I'm sorry, can you rephrase it?

18       Q.  When you spoke to Mr. Davis, are you telling

19   us today that Mr. Davis told you that the black man

20   indicated that he wanted to speak to Dale?

21       A.  I don't recall.

22       Q.  That didn't happen?

23       A.  One of them told me.  I don't know exactly

24   which one, sir, I can't testify to that.

25       Q.  Well, showing you --

1    A.   I know it is not in my report.

2    Q.   Not in your report?

3    A.   No.

4    Q.   That distinctive conversation is not in your

5    report?

6    A.   I didn't write it down, no.

7    Q.   You also indicated you had a meeting with

8    Officer Russell once he came to 1629 East Edwards,

9    right?

10   A.   The area, correct.

11   Q.   And you testified today that you gave him a

12   description of the -- that had been given to you,

13   right?

14   A.   Correct.

15   Q.   And you said a black guy, six foot, 170

16   pounds, black jacket and a cap, right?

17   A.   Close.

18   Q.   You said a black gentleman, six foot, 170

19   pounds, black jacket and a dark hat?

20   A.   Yes.

21   Q.   You would agree that's a fairly generic

22   description of a black person?

23   A.   Generic, I don't know if it's generic.

24   Q.   Fairly undescriptive?  Non-descriptive, I

25   guess?

1    A.    You're asking the six foot, 150 pound part

2    of it.    Are there numerous 6 foot 150 pound black

3    males?

4    Q.    Yeah?

5    A.    Sure there are everywhere.

6    Q.    And there's numerous 6 foot 150 pound black

7    males that wear Starter jackets and jeans?

8    A.    That drive a dark green --

9    Q.    He tied the car to him?

10    A.    I don't know.

11    Q.    Did you recall if he tied the car into him?

12    A.    I don't recall.

13    THE COURT:    We're getting confused, I'm

14    going to interrupt.    When you say he tied the car,

15    what do you mean?

16    A.    Your Honor, when we met, I --

17    THE COURT:    Where.

18    A.    Down two blocks down from the residence.

19    THE COURT:    All right.

20    A.    So that they would not know -- if there was

21    a gun involved we wouldn't want them to know for

22    officer safety.

23    THE COURT:    Keep your voice up.

24    A.    Officer safety.    I met with Officer Russell

25    down the street approximately two blocks.    I gave

1    him a description of why I was there, because he

2    was --

3            THE COURT:  So when you said he tied the

4    car.  You're talking Officer Russell?

5        A.  Officer Russell.

6        Q.  As opposed to the people from Birds 'N

7    Brooks?

8        A.  Correct.  Officer Russell, I gave a

9    description, I said I have a black male described as

10   six foot approximately 150 pounds wearing a black

11   Starter jacket, black stocking cap and jeans.  Told

12   him the situation at Birds 'N Brooks.  Were seen

13   leaving in a green -- dark colored Lexus with the

14   license plate so and so.  I told Officer Russell, I

15   said the car is down there parked in the driveway of

16   16 -- excuse me.

17           THE COURT:  Whatever it was.  He identified

18   the car?

19       A.  Correct, 1629 East Edwards.  He said that's

20   Dossie Sanders' house and that's Dossie Sanders'

21   drives that car.  That's how he made the

22   distinction.  He being Officer Russell.

23           THE COURT:  Go ahead, Mr. Wise.

24       Q.  Finally, you claimed to have a conversation

25   with Mr. Sanders about his mechanic?

1        A.   Correct.

2        Q.   And you indicated today in your testimony

3   that you offered to call the mechanic to confirm

4   whether Mr. Sanders was there?

5        A.   Go to the mechanic, call the mechanic, go to

6   the mechanic.

7        Q.   You don't document -- okay.  You indicate --

8   well, you don't document your offer to Mr. Sanders

9   in your report, do you?

10       A.   Offer to take him to the --

11       Q.   Mechanic?

12       A.   No, not in my report, no, sir.

13           MR. WISE:   No further questions.

14           THE COURT:   All right.  You may step down.

15       (Whereupon the witness was excused.)

16           THE COURT:   Call your next witness,

17   Mr. Wise.

18           MR. WISE:   One second.  I have no further

19   evidence.

20       I would offer Exhibit 1; 1 and 9 are Starter

21   jacket pictures; 1, 3, 4, 5, 9 and 10 into evidence

22   for the purposes of this hearing.

23           THE COURT:   Any objection to the exhibits

24   for this hearing?

25           MS. McINERNEY:   Your Honor, I don't see the

1    relevance of the Starter jacket pictures other than

2    the one Mr. Sanders had on, I would object to that

3    on grounds of relevance.  We could bring in a

4    hundred different jackets that everybody could

5    identify as Starter jackets.  I don't know the

6    relevance of that.

7        I don't have any objections to the others.

8            THE COURT:  I will receive all the

9    exhibits, the photos of Starter jackets over

10   objection, just to show example of Starter jackets,

11   I guess.

12       You're finished, Mr. Wise?  You've rested?

13           MR. WISE:  Yes.

14           THE COURT:  Any evidence on this, Mr. Noll?

15           MR. NOLL:  No.

16           THE COURT:  Any evidence, Ms. McInerney?

17           MS. McINERNEY:  Your Honor, I feel we can

18   argue that there has not been a meeting of the

19   burden and the Government is not really even

20   required to put on any additional evidence from what

21   is here, because I think that the motion has been

22   sustained -- or the motion should be denied based on

23   the evidence that's been presented to the Court.

24       I would like the Court to rule on that at this

25   point.  I believe that the motion to suppress the

1    evidence is a legal motion.  We would rest on our

2    argument on that.

3         I don't believe there's been a showing here

4    that the identification is unreliable.  We would

5    even give the fact that any show-up itself is

6    somewhat suggestive.  It has to be by the very

7    nature of the beast, you might say.  In the sense

8    there's only going to be one person that the person

9    is going to be looking at.  But there's nothing here

10   to show that identification was unreliable.  If

11   fact, there is everything brought out to show it was

12   reliable.  Therefore, we feel the Court should deny

13   the motion to suppress the identification.

14        We also believe the Court should deny the

15   motion to quash the arrest.  There was cause for the

16   arrest without any description made.  That he had a

17   description of the car, a residence, that matched

18   description of the Defendant.  The Defendant matched

19   the description given to him.  They knew he was a

20   felon.  They knew that there was a gun that he had

21   in his possession.  There is probable cause right

22   then and there.

23        The statements that he gave that were lies,

24   basically.  They were not the truth and they were

25   something that you would not -- I mean if, in fact,

he had been at a mechanic's place, surely he would

have taken the officer up on the offer at least to

call or to show a ticket of the sale or try to

confirm that, but did not.  Denying that even his

wife was home to talk to.  All of that would go to

probable cause to make the arrest at that time, even

absent any identification.

THE COURT:  Any argument, Mr. Wise?

MR. WISE:  Yes.

On the issue of the identification, Judge, and

I do have a -- kind of filling in the facts as I

understood them to be, a supplemental memorandum of

law that has been e-filed.  My original memorandum

set forth a bare bones legal factor.  As the facts

developed as I understood them, I filled in the

gaps.

But there is no dispute that the law is that a

show-up identification, where a witness -- witnesses

confront only one suspect, is inherently suggestive

and should only be employed if compelled by

extraordinary circumstances.  That's the 7th Circuit

law as stated in the United States versus Newman.

Newman cited other 7th Circuit decisions which

indicate that without question, almost any

one-on-one confrontation between a crime victim and

1    a person whom the police present to him as a suspect

2    must convey the message that the police have reason

3    to believe that he's guilty.

4        And the classic statement in Stovall versus

5    Denno, one of the seminal Supreme Court cases on

6    this issue, the practice of showing suspects singly

7    to persons for purposes of identification and not

8    part of a line-up has been widely condemned.

9        That's exactly what happened here.  And I

10   understand there's no per se rule that a one person

11   show-up; while condemned, while only to be done in

12   the most exceptional of circumstances; I understand

13   that's not a per se denial of due process.

14       And what the courts have done in Neil versus

15   Biggers and the Mason case, has set fourth a five

16   part test for this Court to make a determination

17   whether there is reliability in this identification,

18   this confrontation between Mr. Patterson and

19   Mr. Sanders that occurred at 1629 East Edwards in

20   the dark.

21       But when you do that, it's part of the -- as

22   the cases say, it's part of the totality of the

23   circumstances.  And you have to first of all look at

24   this case where I think this conduct, this

25   identification, this show-up here sets new standards

for suggestiveness.

We have a situation where a police officer calls Mr. Patterson to this house.  He has Mr. -- Mr. Sanders arrested, handcuffed in a police car. There's -- and knowing that, knowing that Mr. Patterson is going to come there and attempt to make an identification, there's absolutely no justification for not getting Mr. Patterson out of handcuffs and away from a police car so he isn't distinguished by those factors.  Those factors that say I've got the right guy by the police when the guy is in handcuffs.  That says I've got the right guy.

And there is no justification that was presented to you in this courtroom today that the one person show-up had to be done in that fashion.

Not only that, the testimony here today is that there were other black persons standing around.  Yet the testimony from this officer was that, I asked Mr. Patterson, is that the black man?  Singular.  Is that the black man.  Not is there a black man -- of course, there's nothing in his police report about any other black persons around.  But two or three times, it is protocol, he asked, is that the black man, singular.  Well, he's only talking about one.

1    The guy in handcuffs with at least one police

2    officer at his side.  And he walks up with a

3    flashlight, is this the black man?  This comes as

4    close to a per se denial of due process as there

5    could possibly be.

6        The five factors that the Court applies to

7    determine if there is reliability outside of the

8    suggestiveness, if there's reliability that erases

9    the corruptiveness, or the corruptive nature of the

10   grossly suggestive identification process here is

11   that -- the first one is whether the witness had the

12   opportunity to view the offender.

13       Of course, what happened in Birds 'N Brooks?

14   What we have here is a kind of blending, melding of

15   the -- the officer testifies to my questions, I

16   talked to Davis, Davis told me this, Davis told me

17   that.  Davis told me six feet.  It was only towards

18   the end of my examination where we have this

19   Patterson issue come in.

20       We know that it was -- we don't know who said

21   what to whom.  So we have no clear -- no clear

22   understanding of how Dale Patterson participated in

23   this conversation between the officer and Davis and

24   apparently to some degree according to the officer,

25   Mr. Patterson.

1      We have no idea if it was Patterson that said

2    six feet or if it was Davis that said six feet and

3    Patterson, oh yeah.  This nodding assent or

4    objection.  We have no idea who said black coat,

5    Starter type.  We have this blended melding that

6    doesn't tell us what -- or just how much opportunity

7    Mr. Patterson had or if he had an opportunity, how

8    much did he avail himself of that opportunity.

9      The second factor is -- is the witness's degree

10   of attention during the -- well, the crime.

11   There's -- it's not clear there's even a crime here.

12   The witness's degree of attention during the event

13   at Birds 'N Brooks.

14      Again, we go back to the testimony established

15   that it was Phil Davis that appeared to be the most

16   focused on the black person, the black male and

17   black female in the store.  At least the officer's

18   testimony would bear that out.  It's clear from the

19   testimony that it was Mr. Davis whose attention to

20   the situation compelled him to call the police and

21   obtain a license number.  Patterson's lack of

22   action.  He wasn't the one that ran out the door.

23   He wasn't the one who called the police.  That

24   exposes a lack of attention to the situation.  So

25   that factor wears against reliability in this case.

1    The first two factors weigh against reliability.

2        The third factor is the accuracy of the

3    witness's description of the offender.  Mr. -- we

4    have a description from we don't know who.  We have

5    this combination description of six feet.  You look

6    at that picture and no one would mistake Dossie

7    Sanders for six feet tall.  150, that's fair, I'll

8    give them that one.  He is certainly black.  But he

9    has very -- he has facial hair in that photograph, a

10   very, very distinctive characteristic.  Neither

11   Mr. Patterson or Mr. Davis said that.  He has gold

12   front teeth, a wildly descriptive feature,

13   distinctive feature.  Neither Patterson or Davis say

14   that.

15       We have a black Starter type jacket.  That

16   jacket cannot be described as black.  Today we have

17   the johnny-come-lately witness from the statement,

18   one of them said something about silver that isn't

19   in the police report.  If it isn't there, if it

20   isn't documented, it didn't happen.  I understand

21   sometimes impeachment by omission is used to excess.

22   But in this case, no.  You know, if you don't

23   document that, then it didn't happen, and that's a

24   Johnny come lately fudging.

25       You have a stocking cap that is distinctive in

1    that it has a bill.  Mr. Patterson runs a military

2    surplus store.  For god's sake, he's seen MASH, he

3    knows what -- he can describe that hat.  He probably

4    has a hundred thousand of them in the back room.

5        So we have -- we have blue jeans.  That's --

6    you know, come on.

7        So we have the third factor, the accuracy of

8    the witness's description being so lacking, so lame,

9    so benign, that this factor doesn't weigh in favor

10   of reliability.

11       The fourth factor the Court employs is a level

12   of certainty demonstrated by the witness at the time

13   of the confrontation.  In this case, Patterson's

14   level of certainty is -- can only be described as

15   corrupted by the suggestive situation.  He was

16   exposed to the officer's belief we have the right

17   man because he was in handcuffs, Sanders is in

18   handcuffs in the squad car, he is accompanied an by

19   an officer with a flashlight.  That factor cannot be

20   used -- can only be said to be corruptive by the

21   circumstances.

22       And the final factor that the Court should

23   employ is the amount of time that elapsed between

24   the incident and the identification.  An hour and

25   45, between 5:15 and just before 7:00.  You know,

```
1   what happened?  Did Phil Davis, after he called the
2   police and spoke with the police and after he got
3   the license number, sit-down and talk with
4   Patterson?  We don't know.  We don't know.
5   Nothing -- and that wasn't filled in for us.
6           THE COURT:  It's your burden.  You could
7   have filled it.
8           MR. WISE:  No, no, my burden is to show
9   suggestive identification.  It is the state's burden
10  to show reliability.
11          THE COURT:  The Government's, you're right.
12          MR. WISE:  The totality of the
13  circumstances demonstrates unreliability of Dale
14  Patterson's identification and of a one person
15  show-up has been overcome in this case.  The
16  identification is unreliable and it is a violation
17  of due process.
18          THE COURT:  Let me see the exhibits, the
19  photos in particular.  Everyone has seen them but
20  me.  If you want me to use them, give them to me.
21          MR. WISE:  I had them all set up to
22  publish, but they wanted to get through this, so --
23          THE COURT:  Let me see them one way or the
24  other.
25      Mr. Noll, any argument?
```

KATHY J. SULLIVAN, CSR, RPR
OFFICIAL COURT REPORTER

1          MR. NOLL:  Judge, the Court is asking for

2    argument on identification and arrest of

3    Mr. Sanders?

4          THE COURT:  I'm sorry?

5          MR. NOLL:  We're solely dealing with the

6    issue of identification and arrest of Mr. Sanders?

7          THE COURT:  We're dealing with the motion

8    to suppress identification which dovetails into the

9    motion to quash arrest.

10          MR. NOLL:  No, I have nothing further.  I

11    believe counsel has a very well stated position.

12          THE COURT:  Okay.

13      You're right with respect to the burden.  I

14    misspoke, you had the initial burden which was to

15    show suggestive identification.

16      Okay.  What do we have here?  We have two

17    individuals who went to Birds 'N Brooks, black male,

18    black female.  Black male showed the Birds 'N Brooks

19    employee a gun, asked for some .40 caliber

20    ammunition for it.  It didn't take .40 caliber

21    ammunition, it took some other kind of caliber.

22      When the employee inspected the gun, took the

23    magazine out, he noticed the magazine said

24    restricted.  He noticed it was holster sworn, as the

25    witness described that.  He asked for A FOID card.

1    The black male said he didn't have one.  The black

2    woman went to a car to get one, a FOID card, came

3    back, and the employee wasn't going to sell to the

4    black woman because he perceived that it was going

5    to be used by the black male who didn't have a FOID

6    card.

7         The owner or other employee, I'm not sure if he

8    is an owner, Mr. Patterson was requested by name, by

9    first name.  He came up.  Mr. Davis and

10   Mr. Patterson spoke to the individuals who had come

11   into the store at a distance of two to four feet.

12   When the individuals left, Mr. Davis went out and

13   got the license number of the car in which they

14   left, called the police.

15        When the police officer went to the shop,

16   Mr. Davis, corroborated by Mr. Patterson, described

17   what had happened.  Described the individuals, gave

18   the license plate number to the officers, described

19   the car as dark.  And the officer ran the plate and

20   came to the address where the Defendants were.

21        Went there, knocked on the door, Mr. Dossie

22   Sanders came, said he didn't want to speak to them.

23   Came to the door.  They dealt with some other car in

24   the street that was running.  And then Mr. Dossie

25   Sanders went outside, spoke with the officers.  They

asked him if he had been to Birds 'N Brooks, he said
no.  Asked him where he had been at the time in
question, he said he had been at his mechanic's.  He
said the person we now know to be his wife had
driven the Lexus.  That she wasn't home, but in fact
she was home.

He was wearing, Mr. Sanders was wearing jeans,
a black stocking cap with a small bill.  The
description by Mr. Wise that it resembled what Radar
O'Reilly wore in the TV show MASH I think is very
accurate.  I'm old enough to have seen it.  Except
for the color, it is a dark black color, does have a
small insignia on it.

He was wearing the jeans, that cap, and he was
wearing a jacket that, forgive me, Mr. Wise, I would
describe it as a black jacket with silver designs on
it, distinctive designs.  Some I suppose might call
it a silver jacket.

Mr. Wise says no one would say this man was six
feet tall.  I'm not real good at the estimates.
There's nothing in the picture that has a chart
behind it to tell us exactly.  The weight is
approximate.

So, we've got that much going.  The officer
then called Mr. Patterson, who had told him that he

1    would come and identify someone if someone were

2    apprehended.  Mr. Patterson went to the scene.  Was

3    asked by the officer, do you see the black male.  At

4    that point the Defendant Dossie Sanders was in a

5    police car and handcuffed or standing by a police

6    car.  He was gotten out of the police car, if he

7    hadn't already been gotten out, and the officer put

8    a flashlight on him and Mr. Patterson identified him

9    as the person who had been in the store.  And

10   commented he was wearing the same clothes as he had

11   worn earlier.  He likewise identified Mrs. Sanders,

12   and I think indicated she was wearing the same

13   cloths as well.

14       Now, the motion is to suppress that

15   identification of each Defendant because of the

16   suggestive nature of the procedures used.  It was a

17   show-up rather than a lineup.  And it has aspects

18   that are undoubtedly suggestive because of the

19   nature of the show-up.  It's one person basically.

20   And with respect to Mr. Sanders, he was handcuffed

21   and in or around a police car.  So that adds extra

22   suggestiveness to the procedure.

23       There is a reason for doing show-ups, however.

24   They allow a quick verification of whether the

25   person that the police have is the correct person;

1    particularly when he asserted he was not and he was

2    somewhere else at the time.  It would enable a quick

3    release of him if Mr. Patterson had said, no, that's

4    not the right guy.

5         It also allows for a quick identification

6    procedure before a witness could change his

7    appearance, and while the witness's memory is fresh.

8    And so they are not barred altogether.

9         In looking at whether the identification

10   procedure is so suggestive that the evidence should

11   be suppressed, the Court is suppose to consider

12   whether the witness had an adequate opportunity to

13   see the person he identifies at the time of the

14   incident.  The degree of attention he paid to the

15   person at that time.  The accuracy of the witness's

16   description that was given before the identification

17   process; before the show-up in this case.  The level

18   of certainty of the witness in making the

19   identification.  And the amount of time between the

20   initial viewing and the identification procedure

21   used.

22        Here, both Mr. Davis and Mr. Patterson had the

23   opportunity to view both of the individuals who came

24   into Birds 'N Brooks at very close distance for

25   several minutes, it would appear, for this series of

1    conversations to take place and for the lady to go

2    back to the car to get the FOID and come back into

3    the store.

4        This was during business hours.  There's

5    nothing to suggest that the witnesses could not see

6    the individuals or that the individuals were masked

7    in any way.  So the opportunity to see at close

8    distance was there.

9        The degree of attention of the witnesses

10   undoubtedly became heightened when they saw the gun

11   was not one that would take the ammunition that was

12   requested.  Was certainly heightened again when the

13   magazine had the inscription that it had.  I can't

14   quote it at this moment, but restricted, law

15   enforcement use, something of that nature.

16       Their observation that the weapon was holster

17   worn would lead them further to have suspicions that

18   it was a police gun on top of everything else.

19       So certainly at that point one would conclude

20   reasonably that the witness's degree of attention

21   was heightened.  And the fact that they walked out,

22   one of them at least, walked out to position himself

23   to get the license number indicates that the

24   witnesses were very concerned that something was

25   awry here.  So the degree of attention was high.

1    In terms of the accuracy of the description

2  given prior to the suggestive procedure as to

3  Mr. Sanders; or the gentleman who became

4  Mr. Sanders; the description was quite accurate,

5  although generally pretty generic.  But the person

6  was identified as someone wearing jeans.

7  Mr. Sanders was wearing jeans.  He was identified as

8  wearing a dark stocking cap.  This cap, although it

9  has a small bill, would readily be described as a

10  stocking cap.  It has the knit turn up material that

11  goes with stocking caps.  It is black.

12    He was wearing a black, silky jacket with

13  silver on it.  One of the witnesses said it had

14  silver on it.  His height and weight are not too

15  awry, so the description is pretty accurate.

16  Although the Court would agree it is generic, it

17  would fit what the Defendant Dossie Sanders was

18  wearing.

19    The amount of time between the viewing in the

20  store and the identification procedure is an hour

21  and a half to two hours.  Let's say two hours.  That

22  is still a pretty close proximity in terms of time.

23    So in looking at all of the factors, I am of

24  the opinion, particularly because of the degree of

25  attention that the witnesses undoubtedly gave in the

1    store and their opportunity to observe in the store,

2    that the suggestive procedures do not so taint the

3    identification that it should be suppressed.

4        The Court is of the opinion that even with the

5    suggestive nature of how the identification was

6    handled, there was a strong basis for the witness to

7    make the identification he made independent of any

8    taint from the suggestive procedures.

9        So the motion to suppress the identification

10   made by Mr. Patterson on Edwards Street is denied.

11   And the attendant part of the motion to suppress all

12   identification is also denied.  Each witness had a

13   good opportunity to see these individuals at the

14   store.

15       Related to that is the motion to quash arrest.

16   Do you want to say or offer anything further on that

17   motion, Mr. Wise?

18           MR. WISE:  Your Honor, I would add that of

19   course one prong of the motion was that the arrest

20   is the fruit of the bad identification.

21           THE COURT:  Right.

22           MR. WISE:  I think we know how you'll rule

23   on that one at this point.

24       But the second issue then becomes even if this

25   is Dossie Sanders, I did not hear this -- any

1    evidence in this courtroom today that the officer
2    knew that Mr. Sanders was a convicted felon.  I
3    don't think that evidence was established here
4    today.  It wasn't.
5        And certainly this issue of the duty weapon --
6            THE COURT:  Okay.  I'm on the motion to
7    quash the arrest.  You're on the motion to --
8            MR. WISE:  No, no, I'm -- he was arrested
9    for apparently being -- I don't know what he was
10   arrested for.  It was either being a felon in
11   possession of a firearm, or being in possession of a
12   weapon that he shouldn't have.  There was no
13   testimony that he was a felon prior to arrest in
14   this hearing today.
15           THE COURT:  Okay, I'm with you, never mind.
16   Excuse me, go right ahead.
17           MR. WISE:  Yeah, there was testimony in
18   this hearing today that he was a felon.  That the
19   cops knew he was a felon prior to the arrest.  And
20   there's -- the testimony that yeah, I knew there was
21   a weapon gone, without any explanation of when that
22   happened.  Was it five years ago?  Making that
23   officer's -- making the officer's knowledge utterly
24   stale and unusable.  Did it happen two days ago?
25   Did it happen in what part of town?  Was this a

weapon that the police officer had bought from the department in the department buy back program and it got stolen from his house? When, where, how?

There is nothing that you heard today that would establish that there was grounds to believe that Mr. Sanders was a felon and therefore couldn't possess a gun in Birds 'N Brooks.

And certainly the testimony about this was a police officer weapon and I guess the inference is may be stolen because the officer said yeah, I knew there was one missing. The testimony, "I knew there was one missing", does not give an officer reasonable grounds to believe that it was that weapon that was at Birds 'N Brooks when there is no description whatsoever of what the basis of the officer's knowledge is. Again, time, you know, temporal proximity the cases talk about. I call that time.

So based on the utter lack of information possessed by the officers of Mr. Sanders being a felon, as we heard today, or this gun was somehow a gun he shouldn't have, there was no basis for the arrest after the brief conversation at -- outside of his home.

THE COURT: Okay. Do you have any

comments, Mr. Noll, on this --

        MR. NOLL:  Judge, we have joined in these

motions on behalf of Andeatte Sanders.  I would

point out that as you apply it to Andeatte Sanders,

there has been no showing at any time, in this

court, pre-trial discovery, that she knew or had any

knowledge that her husband was a convicted felon.

And this is one of the reasons I was asking the

police officer earlier.  That was I wanted if see

what type of background investigation had been done

by Mr. Patterson or the employees at Birds 'N Brooks

to alert my client, who was there, that her husband

was a convicted felon.

    So she's in a somewhat similar situation in

terms of all the evidence, but there's one other

factor that the Government failed to prove any time

any where, and that is that she knew it was illegal

for him to have a weapon.  So that's the additional

point we want to make on the record.

        THE COURT:  Ms. McInerney.

        MS. McINERNEY:  Well, Mr. Wise is probably

correct.  I thought I asked a question if they knew

he was a felon.  If the Court wants me to I can

recall and open that part of the hearing and bring

the witness back who would testify that he knew

1    Dossie Sanders was a felon, and also that

2    Mr. Sanders was asked that question and admitted he

3    was a felon --

4             THE COURT:  Okay.  To complete the

5    record -- I'm sure it wasn't asked.

6             MS. McINERNEY:  I think you're right.

7             THE COURT:  If you want to reopen your

8    case, call your witness.

9             MR. NOLL:  Can we take a break?

10            MR. WISE:  While I'm thinking of it, I move

11   to reopen.

12            THE COURT:  All right.  Well, overruled, I

13   thought it was just a legal issue, but it's not.

14        We'll take ten minutes, then we'll start.

15        (Whereupon a break was taken.)

16            THE COURT:  All right.  Ms. McInerney, you

17   can call your witness.

18            MS. McINERNEY:  I would call back to the

19   stand Officer Dahlcamp.

20            THE COURT:  All right.  Come on back up and

21   have a seat, you're still under oath, officer.

22        Okay.  Ms. McInerney, you may proceed.

23            MS. McINERNEY:  Thank you, Your Honor.

24                 STEVE DAHLCAMP

25   recalled as witness herein, having been duly sworn,

1    was examined and testified as follows:

2                    DIRECT EXAMINATION

3    BY MS. McINERNEY:

4        Q.   You're Officer Dahlcamp, the same witness

5    who testified on behalf of the defense in the

6    earlier part of this hearing, correct?

7        A.   Correct.

8        Q.   You're still under oath, you understand

9    that?

10       A.   Yes.

11       Q.   Let me ask you, let's go back to the event

12   where you're at Mr. Sanders' residence.  Before you

13   placed him under arrest had you determined whether

14   or not Mr. Sanders was a felon?

15       A.   I don't know.  If I could refresh my memory

16   on my report.

17       Q.   Well, okay.  If you need to refresh --

18       A.   I know he had no FOID card.

19       Q.   You knew he had no FOID card.  Did you

20   determine whether he had any prior felony

21   convictions?

22       A.   I ran his name through dispatch and dispatch

23   advised he had spent time in Shawnee Correctional

24   Center.

25       Q.   What you don't recall is exactly what time

1    you did that that evening, is that correct?

2        A.   Correct.

3        Q.   But you did know that that evening?

4        A.   Yes, I did.

5            MS. McINERNEY:   Your Honor, those are my

6    questions.

7            THE COURT:   Mr. Wise.

8            MR. WISE:   I have no further questions.

9    I'm sorry, I should stand.  I have no further

10   questions.

11           THE COURT:   Mr. Noll?

12           MR. NOLL:   No further questions, thank you

13   for asking.

14           THE COURT:   At the time you executed the

15   search warrant, did you know at that point?

16       A.   Yes, before we sought the search warrant I

17   ran a criminal history on Mr. Sanders, and dispatch

18   advised he was a convicted felon.

19           THE COURT:   But you don't know at which

20   point before that you knew?

21       A.   I did that after -- as I was sitting in my

22   squad car on 17th Street watching the rear of the

23   residence before Dossie came out the second time.

24       So obviously he was not -- it's not in my

25   report, he was not under arrest at that time.

1          THE COURT:  Is that when you learned that

2     he was a convicted felon?

3          A.  Yes.  His criminal history showed he spent

4     time in Graham and Shawnee Correctional facility.

5          THE COURT:  Okay.  That's when you asked

6     dispatch about it?

7          A.  Yes, I verified on my M.V.T. portable

8     computer.  Then, of course, we have to go through

9     our main terminal at dispatch for official word.

10          THE COURT:  Anyone have any further

11     questions of the witness?

12          MR. NOLL:  No.

13          MS. McINERNEY:  No, Judge.

14          MR. WISE:  No, ma'am.

15          THE COURT:  Thank you, you're excused.

16     (Whereupon the witness was excused.)

17          THE COURT:  Any other evidence on this

18     aspect of the motion?

19          MS. McINERNEY:  No, Your Honor.

20          THE COURT:  Or Mr. Wise or Mr. Noll?

21          MR. WISE:  Not on this aspect, Judge.

22     You're talking about the convicted felon issue?

23          THE COURT:  Yes.

24          MR. WISE:  No.

25          THE COURT:  All right.  Anybody have

1    anything on the motion to quash?  Ms. McInerney.

2         MS. McINERNEY:  I think they had given you

3    the argument, but I had not.

4         THE COURT:  Right.  You said you thought

5    maybe you should call a witness.  Although I'm not

6    sure we heard Mr. Noll's argument.  Maybe we did.  I

7    heard Mr. Wise's argument.  Mr. Noll, do have

8    argument on the motion to quash arrest?

9         MR. NOLL:  No, Your Honor.  Nothing

10   further.

11        THE COURT:  Anything else, Ms. McInerny?

12        MS. McINERNEY:  There was probable cause to

13   arrest both the individuals at Birds 'N Brooks; a

14   person without a FOID card wanted to purchase ammo

15   for someone without a FOID card, she knew that at

16   the time.  Mrs. Sanders knew that at the time

17   because she was present when that attempt was made.

18   She went out to the car to get a FOID card to bring

19   back in to try and accomplish the purchase of that

20   ammunition with a FOID, what we would call a straw

21   purchase, which is an illegal -- which is an illegal

22   transaction.

23        There was probable cause to arrest both

24   defendants at the time that they were arrested.

25        THE COURT:  Okay.

1          MR. NOLL:  Judge, can I be heard briefly?

2          THE COURT:  Yes.

3          MR. NOLL:  Judge, Birds 'N Brooks didn't do

4    any type of background investigation of Mr. Sanders.

5    He had no FOID card, so my client went out to the

6    car to get her FOID card.  There's no showing by the

7    Government that at any point in time my client knew

8    that Mr. Sanders was a convicted felon.  To construe

9    some factor to the fact she went out to get a FOID

10   card, there's no evidence, none at all.  They can't

11   present any.  That's the problem in linking her up

12   with the arrest and search of her house, linking her

13   to something that may have been guilty of a third

14   party without her knowledge.  Whether she's a wife,

15   girlfriend, or friend down the street, whatever.

16   They have no nexus, no connection, that's why we

17   feel it is a valid position to take.

18          THE COURT:  All right.  We have several

19   potential crimes for which I think there was

20   probable cause, even without any knowledge by

21   anybody that he was a convicted felon.  I think

22   you've got probable cause to arrest for a stolen

23   weapon based on what was observed by the people at

24   Birds 'N Brooks.  And the fact that it may be an old

25   stolen weapon or a new one doesn't negate the fact

1    that there's a lot of indication that this is a

2    police weapon and these two are not police officers.

3    That would give probable cause to believe that each

4    of them had committed a crime.

5        That she was assisting him in the efforts to

6    obtain the ammunition by giving her FOID card in a

7    situation where it was apparent to everyone that he

8    was the one interested in getting the ammunition,

9    and he shouldn't have it.

10        Beyond that there is probable cause to

11    establish that he was a convicted felon; at least

12    for his own arrest.

13        And thirdly, even if there was no probable

14    cause at the time that Mr. Sanders was initially put

15    in custody, there was certainly enough to detain him

16    for an investigatory stop for a couple of hours to

17    see if the witness could identify him.  And at that

18    point there was certainly probable cause again for

19    the arrest of each of the Defendants on the stolen

20    weapon if not on anything else.

21        So I think there's an abundance of probable

22    cause for the arrest of each Defendant, and the

23    motion to quash the arrest of each is denied.

24        The final motion is the motion with respect to

25    the search warrant.  I forget how that's labelled.

1           MS. McINERNEY:  It's motion to suppress

2    evidence.

3           THE COURT:  Which is the one we didn't let

4    you start on a while ago, right?  I believe that one

5    should just be an argument.  Does anyone differ with

6    that?

7       Hearing no difference, that's where we will

8    start.  I believe you filed it, Mr. Wise, we will

9    let you argue first.

10          MR. WISE:  Your Honor, the arguments I have

11   to make on that issue are dwindling a bit because

12   the argument is first that the warrant did not --

13   that the warrant was the product of an

14   unconstitutional identification and then an

15   unconstitutional arrest.

16      So we're down to the last portion of the

17   argument, and that is the warrant -- there's a

18   distinct difference between the language on the

19   warrant and the language that was presented to the

20   judge in the warrant application process.

21      The warrant application process, the police

22   officer, I think it was actually Officer Dahlcamp

23   who prepared the warrant, on the affidavit explained

24   in sum and substance some of his testimony here

25   today, including a description of this gun that was

1    at Birds 'N Brooks, the Sig Sauer P229 .357 caliber.

2         Amazingly -- and that's the gun they wanted to

3    find.  That's the one gun they had any knowledge of

4    the person that they identified as Dossie Sanders

5    possessing.

6         However, when you look at the warrant, the

7    warrant -- the warrant does not describe that gun as

8    the item to be seized, it describes again

9    generically and ambiguously, any gun, any ammo, any

10   shell casings, any -- the kind of kitchen sink

11   language when it comes to guns.  And that is -- as

12   the courts have said, the Supreme Court case, Grover

13   Ramirez, don't care what's in the application,

14   particularity has to be stated in the warrant

15   itself.  That's explicitly what the 4th Amendment

16   says.

17        In that case I understand the distinction that

18   the warrant in that case said item to be seized, a

19   house.  Well, there's an obvious difference there.

20   But what happened here, it appears, is that while

21   the officers told Judge Nardulli, hey, we have a

22   basis to seize a gun, a Sig Sauer P229 .357, and

23   here's the reason why.  We get to the search

24   warrant, the document that has to state with

25   particularity, with 4th Amendment particularity,

what they want to seize, we have the kitchen sink;

any gun.  And that doesn't cut it.

I understand that there's the argument that,

oh, he's a convicted felon, he can't have any gun.

Well, there's a person that lives in that house,

they knows that lives in that house that has a valid

FOID card.  So what the warrant sanctioned is a

general rummaging through the house when

Mrs. Sanders is completely capable of lawfully

possessing a firearm.  That's just not acceptable.

This is not a situation, I think on the state's

second argument; I'll anticipate by their response;

they haven't proved here, and 7th Circuit cases also

reflect that the warrant is a document that has to

show particularity, well, this was attached.  And

there's apparently some legal exception for that.

And simply attaching three documents to the

motion doesn't mean that when the warrant was

presented at the Sanders' home, that all three --

that the affidavit which states the particularity,

cures the deficiency on the face of the warrant.

That's something they have to prove not by simply

stapling three documents to the back of a motion.

And it doesn't help that the face of the

warrant has boilerplate language on it about

1    attachment.  That doesn't help.  There has to be

2    some proof if they are going to cure the deficiency,

3    to cure the particularity deficiency that this was

4    attached.  And there was none.

5         So we have a warrant that was dumbed down.  We

6    have particularity in the affidavit, I acknowledge

7    that.  The face of the warrant is dumbed down to

8    say, oh, we want every gun.  It would be like in a

9    theft of jewelry case, the officers have specific

10   knowledge that a Rolex watch is stolen, but in

11   the -- and they put that in the affidavit, but in

12   the warrant for the house they want to search we

13   want to seize any and all jewelry.  That I think is

14   the analogy, except for maybe the distinction of the

15   convicted felon angle, because even a convicted

16   felon could possess jewelry.

17        But here there was a person in the house that

18   could lawfully possess a firearm.  And the warrant,

19   on its face, authorized a general rummaging as

20   opposed to a search for the particular weapon the

21   affidavit discussed.  And therefore the warrant was

22   in violation of the 4th amendment.

23            THE COURT:  Mr. Noll.

24            MR. NOLL:  Thank you, Judge.

25        I would join in the, and add an additional

1    factor.  Judge, within the four corners of the
2    affidavit that Officer Dahlcamp executed, there is
3    no intimation, there is no statement that the gun
4    was believed to have been stolen.
5        In fact, he had made testimony in this court
6    that he knew that there were -- there were weapons
7    missing within the department; I can't remember the
8    officer's name who lost the weapon; but there's
9    nothing in the four corners of the affidavit
10   reflecting that the weapon per se was stolen, lost,
11   or in any way improper for the individual to have.
12       When I say that, improper for my client to
13   have.  So that, coupling that with counsel's
14   argument, once they find this very particular
15   weapon, then at that point in time the purpose of
16   the affidavit is met.  And then it can be determined
17   whether it's stolen, whether it's improper for
18   Mr. Sanders to have it.  But in any event, it
19   doesn't allow the blanket mass search of my client's
20   properties, specifically her safe or other
21   properties.
22       So the affidavit is very particular, but
23   doesn't say it was stolen.  It provides no legal
24   basis why a weapon that is restricted for police --
25   restricted law enforcement use only is illegal per

1    se.   That's not stated per se that Judge Nardulli

2    could have somehow garnered this was stolen or

3    surmised it was stolen.

4        And it's a situation where given the limited,

5    narrow nature of the affidavit, that the search

6    should have also been limited and narrow.   And once

7    they found that, the search should have been

8    concluded.   To allow for a much greater extent we

9    think is beyond the scope of the search warrant

10   itself.

11       Do you have any questions, Judge?

12           THE COURT:   No, I don't.

13   Ms. McInerney.

14           MS. McINERNEY:   Well, Your Honor, the 7th

15   Circuit law makes it clear that if in fact the

16   affidavit is attached to the search warrant; as it

17   was in this case, which is part of the exhibits

18   filed with the Government's response in this case;

19   that if that is more particular, that the

20   particularity can be accepted as being on the face

21   of the search warrant.

22       This was not just the affidavit that was with

23   regard to the application, but it was also

24   incorporated with reference in the search warrant

25   itself.

1      Also, Mr. Sanders was a felon.  They knew that.

2   They knew he had a weapon.  They knew he had asked

3   for .40 caliber ammunition for the weapon when in

4   fact it took something different.  He couldn't have

5   a firearm period.  It didn't matter that

6   Mrs. Sanders could have a firearm, Mr. Sanders could

7   not.  They knew at that point that he had walked in

8   with a firearm; one that was suspected to be stolen;

9   and wanted different caliber ammunition than even

10  what that gun took.  He could not have it.  Tried to

11  attempt a straw purchase at that time.

12      There's reasonable inference there from the

13  facts that what they asked for, the firearms and the

14  ownership of firearms, is very reasonable under the

15  circumstances presented in this case.

16      Now, didn't ask to go for anything else, it's

17  all direct to what was presented at the time at

18  Birds 'N Brooks, identification as to ownership of

19  the firearm, that documentation, the magazine clips;

20  all of that which would have been particular to

21  events as they unfolded there at Birds 'N Brooks,

22  and as they unfolded in front of the Sanders'

23  residence.

24          THE COURT:  Okay.  I've already found that

25  the identification was valid.  The arrest was also

1    valid.

2        The search warrant follows, and the affidavit

3    attached to the search warrant was from

4    Mr. Dahlcamp.  In summary it's what he testified to

5    here.  It also noted that the magazine shown to the

6    people at Birds 'N Brooks, the magazine contained in

7    the gun shown to the people had restricted law

8    enforcement use only stamped onto it.

9        It seems to me that rises to giving probable

10   cause to believe that it's a law enforcement gun,

11   and these folks are not law enforcement people.

12       Now, it could be that the gun was taken out of

13   use and just had this stamped on it, but in terms of

14   probable cause, I think there is probable cause to

15   issue the warrant for the gun in question.

16       At the time the warrant was issued it was made

17   known to the judge in the affidavit that Mr. Sanders

18   was a convicted felon.  So he was not allowed to

19   have any firearms or ammunition.  It was also

20   apparent that he had tried to buy ammunition for the

21   gun that said restricted law enforcement only, and

22   had tried to buy the wrong caliber.  Which would

23   lead to some concern that there were other guns he

24   shouldn't have that he may have.  He was at the

25   residence that was to be searched at the time that

1    he was identified.

2        So all of those reasons come together in my

3    judgment to validate the language on the face of the

4    search warrant that any and all firearms, live

5    ammunition, spent casings, magazines or clips could

6    be taken.

7        I don't find this to be such a general warrant

8    that it is improper under the circumstances of this

9    case.   The things to be seized were items that went

10   to ammunition and residency.   And I think in this

11   instance there was an adequate basis for that

12   language.   So the motion to suppress evidence is

13   also denied as to both Defendants.

14       I think that's all of the pending motions.

15   Have I missed anything?

16           MR. WISE:  Not -- that's all I filed.

17           THE COURT:  Mr. Noll?

18           MR. NOLL:  Judge, I anticipate we may have

19   some motions in limine going to the evidence, but we

20   will get those on file soon so we will be ready for

21   trial.

22       But that's in terms of substantive motions we

23   have.   I would like to know before we leave today

24   the likelihood of going to trial in December.   I

25   know you're on a floating docket, I just want to see

1    whether we're floating high or floating low.

2          THE COURT:  I have one other case that

3    indicates a need to be tried as well.  It's a toss

4    up as to which goes first as to the first week of

5    December.  We may be able to get them both tried if

6    we can go back to back.

7        How long a case do you think this will be,

8    folks?

9          MR. NOLL:  Three days.

10          MS. McINERNEY:  I think that's -- I think

11    that's accurate.

12          THE COURT:  Mr. Wise, you think we can do

13    it in three?

14          MR. WISE:  I hadn't given that question

15    much thought, but I can't imagine it would take more

16    than three days.

17          THE COURT:  Give me just a moment here.

18        If we can't do it the 5th, we could for sure do

19    it the 12th of December.  So December looks pretty

20    good.

21          MR. NOLL:  My only conflict I have one

22    before Judge Mills starting on the 6th.  So I may

23    need some assistance from this Court to give me air

24    cover on first floor.

25          THE COURT:  How much -- how long is that

1    one?

2              MR. NOLL:  First of all, the defendants are

3    not incarcerated.  It's girlfriend/boyfriend,

4    methamphetamine out of Christian County.  Probably

5    three to four day trial on that one.

6              THE COURT:  Okay.  I mean can you do this

7    one after that one?  Can you go back to back?

8              MR. NOLL:  Judge, Roger Clemmons is my age,

9    they needed to give him another day or two in the

10   rotation.

11             THE COURT:  To get his hamstring settled

12   down?

13             MR. NOLL:  Yes.

14             THE COURT:  See, I know these references

15   counsel tries to give me.  I'm two for two today

16   with the MASH and now Roger Clemmons.  I want that

17   noted for the Appellate Court.

18        You may need to move to continue one case or

19   the other.

20             MR. NOLL:  I do not want to move to

21   continue this one because of the incarcerated

22   defendant.  So I will move --

23             THE COURT:  The 5th or the 12th I can do

24   both cases, one of them will have to go first, one

25   of them will have to go second.  I've told the

one -- the other one, that they cannot go the week

of like the 21st of December.  And somebody is going

on vacation and I can't remember who or why.  So I

don't want to say for certainty which will go first

until everybody -- Ms. McInerny, you might want to

check with Mr. Harris on juggling which will go

first.  I can reach both in December, and intend to

do so.  You remain on the 5th.  You have a final

pre-trial yet to come, we will resolve the rotation

by then.

       MR. NOLL:  Thank you, Judge.

       THE COURT:  Anything further?

       MS. McINERNEY:  Not for the Government,

Your Honor.

       MR. WISE:  Not for Mr. Sanders.

       MR. NOLL:  No, ma'am.

       THE COURT:  All right.  Defendant Dossie

Sanders is remanded to the Marshal.  We will see --

       MR. WISE:  Oh, the exhibits, 9 and 10, the

hat and the coat, how do we -- do I give those to

the Clerk?

       THE COURT:  Do you want them back or do you

want to keep them?

       MR. WISE:  I'll take them back.

       THE COURT:  Okay.  Is that acceptable?  If

1    he takes possession of them, or do you want the

2    Clerk to keep them?

3             MS. McINERNEY:  We would rather the Clerk

4    keep them.

5             THE COURT:  All right.  The Clerk will keep

6    them.  The exhibits from this hearing will be kept

7    by the Clerk.  Make sure she has them before you

8    leave.

9        (Whereupon court was recessed in this case.)

10

11   I, KATHY J. SULLIVAN, CSR, RPR, Official Court

12   Reporter, certify that the foregoing is a correct

13   transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18

19

20

21        _____

22        License #084-002768

23

24

25

KATHY J. SULLIVAN, CSR, RPR
OFFICIAL COURT REPORTER